Will the court call the next case, please? 5-16-05-53, Robert Layden v. Workers' Compensation Commission. Counsel, counsel both, it was filed, the admiral filed a motion for you to file a supplement to the brief. And the court has entered an order banning that motion. Thank you, Your Honor. May it please the court, counsel. My name is David Jerome. I am representing Robert Layden in this case. And I'm going to try to do something that's been a little difficult this morning, trying to get you to reverse a manifest wait decision. It's been difficult? Why do you say that? Because any time it's a manifest wait, you're always going to want to defer to the commission's decision. This one has a unique position because it has, the case is troubling to me as a practitioner. Because throughout all of this, Robert Layden has essentially provided identical testimony regarding how the accident occurred. So the real issue before this court today is whether one erroneous history recorded by the employer's company doctor is enough to negate all of the consistent history provided by Robert Layden. And we know this because at one point, everything on this case was approved. Here's the quick facts. Back on August 23, 2011, Robert's on top of a tanker truck. He's trying to close the hatch. The dog ears on it won't close. He tries once, twice, third time, the shoulder pops. Never had any problems with the shoulder until this date. He climbs down off the truck, calls the dispatch, tells them he's having problems with his shoulder, can't raise his arm up. He also, the dispatch says, you need to talk with the supervisor. Talks with the supervisor, gives him the exact same story. Supervisor says, drive from where you're at, 285 miles to where we're at, so you can go see our company doctor. While he's driving back, he calls his wife, who's a nurse. Tells his wife, here's the problems I've got, here's the symptoms I've got. His wife says, I think you've got a rotator cuff, you need to seek medical treatment immediately. He goes back to the company's place in Shanahan, I think that's how you pronounce it, and he talks not only with the supervisor, but also with the safety manager. He completes a report of injury that day. So everything has been consistent, all of the histories have been, I popped my shoulder trying to snap down that dog ear. Employer has a co-worker send him over to the Morris Healthcare, which is their occupational medicine facility. He reports the same thing to them, that's what he testifies to. Goes back to the company plant, his wife comes and gets him. A couple of days later, he goes to see Dr. Markinson, an orthopedist in St. Louis. Provides the exact same history. Dr. Markinson does an MRI, says you've got a large rotator cuff. Wait a minute, he didn't, the issue is what he reported to Morris, correct? Correct. But at the time when all of this was going on, and the reason why this becomes important is because when he's talking with Markinson, he's not aware of the history that's written by Morris. He tells Markinson of the same dog ear issue. He goes to the insurance company's doctor. Dr. Milne provides the exact same history. Dr. Milne says it's work related because the mechanism of injury is consistent. So at that point, surgery was going to be approved. Then up pops this report from Morris. Morris says, Morris is alleging that he told them specifically he injured his right shoulder when moving four days ago and he had pain because he pulled something moving household items over the weekend. That's pretty specific. So are you saying that Morris just made that up? Well, what we're saying is, what Robert said is, I never told him that. Robert said I told him of the dog ear episode, and more importantly, I had already reported it to three different individuals. Can I ask you a question? If he never told them that, how did they know he was moving? Because he was. He did move. He had moved two weeks prior. At that point, he was moving pots and pans and little things like that. He wasn't moving, and in fact, two men in a truck were the moving company that moved all the heavy items. How did they know that? Because when we talked with Jerry Pearl, the supervisor, yes, that's his name, Jerry Pearl had said, yes, we all knew that he was moving, and also we knew that Parkinson, the safety manager, Talixin, excuse me, the safety manager was also aware of it, and Jerry Pearl had said that when we send someone over to Morris, Talixin would call ahead and tell them what happened. So I think the history may have come from Talixin. For me, it's speculation. Right. So how do we consider that? There was never the employer of this Carl guy denied that, right? Well, he said he didn't know. I had asked him specifically. He said he didn't call though. He said he didn't call him, and I asked him, do you know what Talixin told him? He said, I don't know. And so it's possible that Talixin could have told Morris this history, and to be quite honest, And then they attributed it to the claimant. They got a phone call from the employer, and they put down that the claimant told them that? Well, it doesn't say, claimant says specifically. It just says, here's the history. And the reason why this is important to me is, why would he have told dispatcher, wife, supervisor, safety manager, do a report of injury, tell all these people one history, then go to their company doctor and say something different? If all of these histories were the same, to the point that we almost had the surgery was ready to go until this history popped up, if one of these is an anomaly, at minimum we can say they got the history wrong. Where it came from, we don't know. It is specific to the moving, but all of the people at that plant knew that he had moved. They knew that he had even left early on Friday to go move some things for his house, so the employer was aware of it. So that's why I'm not trying to get into some conspiracy theory saying the employer set him up. What we're saying is, when you take a look at this, if the employee is giving the same history before and after he sees the emergency room, that's why I skipped over that history portion, because he said the same thing to Markinson, said the same thing to the Section 12 examiner, Dr. Milne, if the history by him is consistent throughout, if he says that emergency room history, I never said that. But here's the problem. What you say has quite candidly some intuitive appeal from a logical standpoint, but generally speaking, the report to a medical provider, the first treatment provider, is considered to give some weight to it, okay? So how do we decide that in the midst of speculation, well, you must be correct? We take it upon ourselves to re-read the evidence and decide that more has to be inaccurate. We'd have to make a finding to ignore it, wouldn't we? Yes. How do we do that? Based on what?  Both doctors, Dr. Milne and Dr. Markinson, said doctors get histories wrong all the time. And in this situation, it's the precursor, all of the testimony, all of the things that he told everybody leading up to it, that would lead to the conclusion of why. Why would he give this history? So the two theories would be, well, he's either trying to make up a work comp case, and if that's the case, if he's making up a work comp case, why would the history change when he's going to get medical treatment for that very condition? Or the other would be, well, he had injured himself and he was lying all along to all the other people, which doesn't make sense at all anyway, because if he was lying all along, why would he have not just used his group health insurance and gone that route? But where do we base a decision at? In the absence of some definitive impeachment or contrary evidence, you're basically telling us, in so many words, unless I'm missing something, to sort of ignore the Morris history, because it's out of line with the rest of the evidence, right? And what I'm saying is histories, when put in context of one another, you're allowed to use the intuitive knowledge of knowing that if one doesn't fit the other, then we have histories all the time where the verbiage might be a little different. In fact, one of the other arguments today, the history was a little different. But this is completely incompatible. And you knew at the time of trial that you had this history that was contrary to the histories given to the other medical providers. It was obvious that this was going to be a problem. So how to diffuse it at trial, how to combat that, didn't get Talix in that, right? Didn't have the history taker at Morris testify that this may have been an error. So what's the commission to do? And, Your Honors, you're absolutely right. The reason why those two people, and we were getting ready to depose both of them, we actually had a pretrial two months prior. And this very issue was raised, and that very arbitrator said, I wouldn't find it relevant. So we didn't try and find Talix in who I think had moved out to Arizona or someplace like that. We didn't track him down. We didn't go to Morris because the arbitrator had told us at a pretrial he didn't consider it relevant because it was inconsistent because the history had already been provided to the employer. The employer acknowledged it. The employer, we had taken the depositions, so the employer had acknowledged, yeah, he did tell us, and the only history he told us was of the latches. They never told us of household moving items. Isn't there something else here in the mix? Let's move on to one other thing. Didn't the commission have problems with the claimant's credibility? Didn't they specifically note, they filed a testimony regarding the alleged falsification of driver's logs and repairs. He asserted he observed the employer making to his trailer after the accident, which the employer denied. So wasn't there sort of a theme of questioning the claimant's credibility in some of these matters too? Yes, there was. But to me, whether there's a falsification of driver's logs in the Qualcomm, which is really what that went to, was whether the Qualcomm was accurate and whether there was a log issue, it's a red herring. My guy said and testified, I saw them fixing the latch. Jerry Curl said, no, we didn't have to fix it. To me, that's a non-issue. The real issue here is, what was the history that was provided all along by my client? He never provided the history of moving household items. But I'm saying if the commission had problems with his credibility on one issue, couldn't they have found credibility issues on the other? And if they would have, if they would have said, we don't think that the history that he described of the accident is credible, then I would agree. But if they're saying just generally, we don't find him credible, that's the part that I'm having problems with because he's telling everyone of the same history. No one came in and contested the nature of the accident. No one said that he didn't injure himself on top of that truck. There were no counter-witnesses. They could have called them because there were other people at that location. No one contested the fact that he immediately called the dispatcher. No one contested the fact that he told the supervisor that day that he completed a report of injury, that day before all of this Morris business. So his testimony, and truthfully that's what we're looking at is, is his history of accident consistent? Was there medical testimony that established that his history of closing these latches was inconsistent with the injury itself? No. Dr. Milne originally said at minimum it would aggravate. Dr. Markinson said clearly that would do it. And more importantly, Dr. Markinson went further and he said if he had injured himself on Saturday, as was described, he would not have been able to work Sunday and Monday and Tuesday morning because he would have had a large rotator cuff tear. And also this guy was 69 years old at the time of the injury, lung cancer recovery, 300 plus pounds, and he climbed to the top of a truck. If he had a rotator cuff tear, how could he have done that? Didn't one of the doctors testify he could have? Dr. Milne said it's possible that he could have. Dr. Markinson said no way. Well, okay. We've got to decide which one we're going to listen to. But when it comes down to it, really what the court had said and the whole emphasis here is whether the Morris history is enough to negate all of the histories that had consistently been given by Robert, both before and after. And so it's when you put it in context that one has to say why would he do this? It doesn't make sense on a practical level, on a logical level. And so then the more realistic conclusion is simply for whatever reason they got the history wrong. And we brought in the testimony of his wife who said that weekend there was no injury, supporting him that there was no injury. He talked with the dispatcher on Monday. No injury, no discussions of injury. If he wanted to falsify a work comp case, why didn't he do it on Monday? Why did he wait and work a whole day and then have it on Tuesday? Well, this is a little unusual, though, because they've got a couple of different entries in the Morris records. Originally, they have him reporting pain as a result of moving four days ago. And then elsewhere, later in the records, they say his key complaint is shoulder pain, moving household items over the weekend, thinks he pulled something. Yes. Thinks he just made that up? Well, to me, that is actually more supportive of what I'm arguing. At the time that he had reached that occupational facility, his wife had already told him, you've got a rotator cuff tear. He didn't think he just pulled something. He was in excruciating pain. He knew he had had a rotator cuff, but he couldn't raise his arm up. And so that's why thinks he pulled something seems like it comes from more of a safety manager or someone else describing what he may have described, but kind of minimizing it, because my guy was saying, I was in excruciating pain. I told them that I did the dog ears and that I couldn't lift my arm over my head. The other thing that I'm looking at, too, is they said move household items. This is a large rotator cuff tear. This isn't something where moving a skillet or moving a small table is going to cause a rotator cuff tear. This is something where we're dealing with something that's going to have some serious impact, something that's going to cause some immediate symptoms. And by Robert's history, and he's said it multiple times before and after that one history, he has said it all began following that event. Counsel, I'm just going back to my last question about whether or not any doctor testified that the mechanism of the injury that the claimant testified to would be inconsistent with the injury itself. And Dr. Milne did look at the video of the demonstration of closing the latch, and he said that it didn't look like that was something that could cause a massive rotator cuff tear, even if you were pushing hard on it. But he did say it could aggravate and make symptomatic the condition. He indicated that it was a massive rotator cuff tear, is that right? Correct, yes. And there's no disagreement that it is a large, massive rotator cuff tear. Thank you. Thank you, Counsel. We have time to talk. Good morning, Your Honors. Good morning, David. Your Honor, this is a manifest for the record. Your name? Brian McGrary, Your Honor, for Hoffman Trucking. I apologize. My feveriness gets ahead of me. A couple items that Mr. Jerome brought out. You've already, evidence that you've looked at the testimony, you know what the crucial facts are. A couple things I want to point out. Counsel focuses on the Morris records as the sole indicia of evidence against him, and that's not true. For instance, he claims that the history was consistent. Mr. Oswald, who's the one who took the phone call from Mr. Layden, denies that Layden gave him that history. He said all he said was, my arm feels strange, I'm having trouble lifting it. That's what he said. No description of the last, no description of the last incident. He said he reported right away. The incident allegedly occurred at 827 in the morning. Oswald said he called me in the afternoon. With regard to not being able to do the work, Dr. Melanie said there was medical evidence, the commission relied upon it, said he could do the work. Even if you believe Dr. Markinson, according to the claimant's own testimony, he climbed down off that truck, put the hose back in, and drove all the way back from Perry, Missouri to Shanahan just south of Joliet. So, by his own testimony, he knew he could do basic functions of the job with that chair. With regard to Your Honor's comments about the medical, Dr. Melanie did note, once he saw that latch video and saw the force part, that's not enough to do it. He also noted that the MRI showed that massive rotator cuff tear could have been there a while because the tendons were retracted and there was fatty infiltrate in the muscle. That was a chronic rotator cuff tear. The point is there's more than one leg upon which the commission's decision was rested. There's multiple evidence. There's multiple evidence of the claimant's credibility issues. There are multiple instances where the claimant changed the story or just outright lied and the commission caught on it. Thank you, Your Honor. We urge you to affirm the commission's decision. Thank you, Counsel. Counsel, you may reply. Thank you, Your Honor. There were two issues that he brought up. One that's interesting, he talked about Mr. Oswald talking about this occurred in the afternoon. If you take a look at the timeline, first of all, he said it occurred in the p.m., didn't give a time frame. But if you take a look at the testimony, after this accident, Robert climbed down off the tanker after he had to sit for a few minutes because he was going to black out, reeled up the hose one arm, finished the paperwork with that company, got back into the truck and drove 285 miles to get back to Chanahut, completed two interviews with the supervisor, with the safety manager, completed paperwork, had a co-worker drive him over to the occupational medicine facility and got there at 529 p.m. If that happened in the p.m., how did he drive 285 miles after completing all of these activities and get there at 529 p.m.? It's a small issue, but it's where I'm telling you Robert is not lying. He's telling the truth in all of this. When he says it happened in the morning, that is consistent, because after driving for that duration, after doing all of those activities, it had to have occurred in the morning, not the afternoon. Also, he's right that Mr. Oswald didn't say that he told me that it happened at work. He said, my arm hurts, can't lift it up. In fact, Mr. Oswald said, well, you know, I thought he was having a heart attack. Well, if he thought he was having a heart attack, why didn't he refer him over to the supervisor and tell him he had to drive 285 miles back to see the company doctor? If he's thinking that he had a heart attack, holy cow, a man having a heart attack and he told him to drive 285 miles? That's not the case. He knew that Robert was telling him, I injured my shoulder, which is why he said, talk to the boss, get up here, we need you to go see our occupational medicine facility, which leads to another issue, too. If he's telling him, my arm hurts like a lightning bolt went through it, why are they so fixed upon getting him up to their doctor? What is it about their doctor that's so magical here that the dispatcher, supervisor, safety manager, all of them are trying to get to that Morris facility? Once again, I'm not trying to say that this is some mission impossible scheme that the employer is trying to make up a history. I don't know where the history came from. Robert doesn't know where the history came from. Unfortunately, we didn't depose those people because we thought arbitrator Lee did not consider it relevant because of the pretrial. In this instance, what we've got, though, is histories before and after that are very consistent. When you take a look at it in full context, it's the old Sesame Street. One of these things is not like the others. If it's not like the other, you've got to figure out why. In this situation, the history is pretty vague. Because if he thought that he had torn his rotator cuff moving a household item, by golly, with that large rotator cuff tear, he's going to know what the item is. Not just vaguely moving household items. Not just, eh, I think I pulled something. He's going to say, this thing hurts like crazy. I was moving a couch. But that's not what he said. But he told us at trial, this consistent before and after, I hurt myself moving those dog ears. So we're asking you to reverse on the issues of medical, the perm total, as well as for the temporary total. Thank you. Thank you, Counsel Bowles. This matter will be taken under advisement. This position shall lift here.